# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Roosevelt Irrigation District,

        Plaintiff,

v.

United States of America, *et al.*,

        Defendants.

No. CV-15-00448-PHX-JJT

**ORDER**

    At issue are the following motions: Defendants and Counterclaimants Salt River Project Agricultural Improvement and Power District ("the District") and Salt River Valley Water Users' Association's ("the Association") (collectively "SRP")[1] Motion for Partial Summary Judgment (Doc. 108, SRP MSJ), to which Defendants the United States, Department of Interior, and the Bureau of Reclamation (collectively, "Federal Defendants") filed a Response in Support (Doc. 110, Fed. Def. Resp.), the Plaintiff Roosevelt Irrigation District ("RID") filed a Response (Doc. 170, RID MSJ), and SRP filed a Reply (Doc. 187, SRP Reply), which the Federal Defendants joined (Doc. 189, Fed. Def. Reply Joinder); RID's Motion for Partial Summary Judgment (Doc. 170, RID MSJ), to which SRP filed a Response (Doc. 207, SRP Resp.), which the Federal Defendants joined (Doc. 209, Fed. Def. Resp. Joinder), and to which RID filed a Reply (Doc. 225, RID Reply).

---

[1] As a threshold matter, because the Association and the District filed their briefing jointly, the Court refers to them collectively as SRP throughout.

The Court heard oral argument on the Motions for Summary Judgment on August 31, 2017. Subsequently, the Court requested that the parties submit briefing addressing this Court's subject matter jurisdiction should it determine that the Warren Act does not govern the contracts at issue (Doc. 262), to which the parties filed supplemental briefing (Doc. 265, RID Suppl. Br.; Doc. 266, Fed. Def. Suppl. Br.; Doc. 267, SRP Suppl. Br.).

For the reasons that follow, the Court denies SRP's Motion for Summary Judgment. The Court further grants in part and denies in part RID's Motion for Summary Judgment.

## I.    BACKGROUND

Put simply, the matter before the Court today concerns the rights and obligations of the parties under agreements entered into by the Association and RID in 1921, 1927, and 1950 (collectively, "Contracts at issue"). The procedural history has woven between multiple state and federal actions. RID first filed an action in Maricopa County in the Superior Court of Arizona to determine whether the Contracts at issue provided RID a permanent water supply (the "State Court Action"). The Superior Court, however, dismissed the action, finding that the United States was an indispensable party under Arizona Rule of Civil Procedure 19. *Roosevelt Irrigation Dist. v. Salt River Valley Water Users Ass'n*, CV2014-008706 (Ariz. Super. Ct. dismissed Oct. 31, 2014). The Superior Court directed RID to bring suit in Federal District Court, which it did by filing the pending declaratory action, naming the Association, the District, the United States, the Department of the Interior, and the Bureau of Reclamation as defendants. RID simultaneously brought an action for quiet title against the United States (the "Quiet Title Action"). *See Roosevelt Irrigation District v. United States*, 15-cv-00439-JJT (D. Ariz. filed Mar. 11, 2015).

RID's Complaint in this case sought the three following judicial declarations with respect to the Contracts at issue: (1) that "RID's right to pump groundwater from its East Side Wells and to transport that water for use within the District does not terminate . . .

on or after October 26, 2020"; (2) "that pursuant to A.R.S. § 45-494, RID's right to pump groundwater from its East Side Wells and to transport that water for use within the District does not terminate on or after October 26, 2020"; and (3) "that there are no legal impediments to RID's continued pumping of the East Side Wells and the right to transport that water for use within the District on or after October 26, 2020." (Doc. 1, Compl. at 14.)

Concurrently with its Complaint, RID filed a Motion to Determine Jurisdiction in this Court. (Doc. 3, Mot. to Determine Juris.) Therein, RID argued that this Court lacked jurisdiction to adjudicate the contractual dispute because the Contracts at issue were not Reclamation contracts and because the United States has sovereign immunity. (Mot. to Determine Juris. at 7.) The United States filed an additional Motion to Dismiss and joined in RID's Motion as to the second part, arguing that this Court lacked jurisdiction on the basis of sovereign immunity. (Doc. 32, U.S. Mot. to Dismiss at 3–5.) SRP then answered, adding its own counter-claims against RID. (Doc. 34, SRP Answer.) In particular, SRP sought judicial declarations that (1) "[t]he 1921 Agreement, as supplemented, is a Warren Act contract and is subject to the requirements and restrictions of the Warren Act"; and (2) that the "1921 Agreement does not exist in perpetuity and expires in 2020, 2024, 2026, or after a reasonable term." (SRP Answer at 41–47.) This Court then found that, based on the allegations and information before it, 43 U.S.C. § 390uu applied to the parties, as the contracts were executed pursuant to Federal reclamation law, thus waiving the United States' sovereign immunity.[2] (Doc. 57, Order.) Accordingly, the parties proceeded to discovery.

On October 24, 2016, SRP filed its Motion for Partial Summary Judgment on Count One of its Counterclaim seeking a determination "whether the 1921 Agreement . . . was authorized, entered into, and approved by the Secretary of the Interior [] pursuant to

---

[2] The Court's findings and conclusions in the Order on the Motion to Determine Jurisdiction were based on the posture of the case and the evidence available at that time. Thus, to the extent that any findings or conclusions in that order are inconsistent with those within this Order, this Order governs.

the Warren Act." (SRP MSJ at 2.) Subsequently, RID filed its own Motion for Partial Summary Judgment on the claims in its Complaint, in addition to Counts One, Two, Three, and Four of SRP's Counterclaim. (RID MSJ at 2.)

### A. Formation of the Salt River Valley Water Users' Association and Construction of the Salt River Project

In 1902, Congress passed the Reclamation Act, a comprehensive statute designed to promote the irrigation and development of arid lands in the Western United States by making federal loans available for the construction of water storage and distribution projects. *See* 43 U.S.C. §§ 371–616. The following year, a conglomerate of land owners in the then-Territory of Arizona banded together to incorporate as The Salt River Valley Water Users' Association. (Doc. 109-2, SRP Separate Statement of Facts ("SRP SSOF") Ex. 1 ¶ 8.) The organization was designed, in part, to allow it to enter into contracts to secure the aid of the United States—under the Reclamation Act—in constructing dams, reservoirs, canals, or other works to allow for the distribution and delivery of water to the lands of Association shareholders. (Doc. 109-2, SRP SSOF, Ex. 3 at 2, § 2.) The following year the organization would enter such an agreement pursuant to the Reclamation Act, contracting with the United States for the construction of the Salt River Federal Reclamation Project (the "1904 Contract"). (Doc. 109-2, SRP SSOF Ex. 2.)

In exchange for the construction of irrigation works along the Salt River, the Association agreed that the Secretary of the Interior would approve certain Association actions and processes, including adoption of rules and regulations "concerning the use of water by its [the Association's] shareholders and concerning the administration of the affairs of the Association, to effectually carry out and promote the purposes of its organization, within the provisions of said Articles of Incorporation." (Doc. 109-2, SRP SSOF Ex. 2 ¶ 8.) The 1904 Contract also provided that the rights of the Association members "are to be defined and determined and enjoyed by and under the provisions of the said Act of Congress [Reclamation Act] and of other Acts of Congress on the subject of the acquisition and enjoyment of the rights to use water." (Doc. 109-2, SRP SSOF Ex. 2 ¶ 10.) Lastly, the 1904 Contract obligated the Association to follow any "rules and

regulations for the administration of the water to be supplied from said proposed irrigation works" that the Secretary of the Interior approves and promulgates. (Doc. 109-2, SRP SSOF Ex. 2 ¶ 11.) After completing the Roosevelt Dam, Reclamation continued to operate the Project for several years. (Doc. 109, SRP SSOF ¶ 5.)

In 1917, the United States and the Association entered into an additional contract (the "1917 Contract") to supplement the parties' 1904 Contract. (Doc. 109-2, SRP SSOF Ex. 5.) As such, the 1917 Contract provided that the 1904 Contract "shall not be held or deemed in any wise to be affected changed or abrogated . . . except . . . by the express terms of this agreement or by reason of irreconcilable inconsistencies." (Doc. 109-2, SRP SSOF Ex. 5 ¶ 2.) In exchange for certain concessions by the Association, the United States agreed to "turn over and vest in the [] Association, the care, operation, and maintenance of the irrigations works known as the Salt River Project." (Doc. 109-2, SRP SSOF Ex. 5 ¶ 3.) In addition, the 1917 Contract contained an express provision requiring that the Association "make no substantial change in any of the said works, without first having obtained the consent thereto, to be expressed in writing, of the Secretary of the Interior." (Doc. 109-2, SRP SSOF Ex. 5 ¶ 6.) The 1917 Contract, however, permitted the Association to "construct additional works at its own cost" without approval as long as those additions did not "impair or diminish the present efficiency or adequacy of the project." (Doc. 109-2, SRP SSOF Ex. 5 ¶ 6.)

In 1937, the Association, with the approval of the Secretary of the Interior, contracted with the newly formed Salt River Project Agricultural Improvement and Power District ("the District") to transfer Association property to the District. (Doc. 109-2, SRP SSOF Ex. 6.) Under the terms of the 1937 Contract, the Association continued to operate the Project as an agent of the District. (Doc. 109-2, SRP SSOF Ex. 6 ¶ 11.) The Association and the District amended the 1937 Contract in 1949, with approval of the Secretary, to allow the District to operate the Project electrical system and dams upstream from the Granite Reef Dam. (Doc. 109-2, SRP SSOF Ex. 6.) The Association and the District continue to operate in this manner to this day.

### B. Waterlogging Issues on Association Lands

Soon after the execution of the 1904 Contract, water began flowing to Association lands. However, the water meant to be a boon to the arid lands of Association shareholders soon became nuisance. (Doc. 109, SRP SSOF ¶ 11, Doc. 171, RID Amended Separate Statement of Facts ("RID SSOF") ¶ 2.) By the late 1910s and into the 1920s, Association lands became waterlogged, threatening the viability of farming on the lands within. *See Brewster v. Salt River Valley Water Users' Ass'n*, 229 P. 929, 931–32 (Ariz. 1924); (Doc. 109, RID SSOF ¶ 2, Doc. 171, SRP SSOF ¶ 11.) The Association, at its own expense, began installing a pumping system and sinking wells on Association land to remove excess water from the ground. *See id.* at 932; (Doc. 109, SRP SSOF ¶ 12, Doc. 171, RID SSOF ¶ 3.) Intending to reduce the cost to its own shareholders, the Association soon after began contracting out the right to remove water to third parties located west of Association lands. (Doc. 109, SRP SSOF ¶ 13.)

In June 1920, the Association entered into one such agreement with A.A. Carrick and Frank J. Mangham ("C&M") for the draining of portions of Association lands (the 1920 Contract). (Doc. 109-2, SRP SSOF Ex. 7 ¶ 13.) Under the terms of the contract, C&M agreed to install pumping equipment, canals, ditches, and other works necessary for draining portions of Association lands, and in exchange were permitted to pump and use water from Association lands. (Doc. 109-2, SRP SSOF Ex. 7 ¶ 1.) The parties later supplemented the original 1920 contract, adding provisions to ensure compliance with the Warren Act of 1911. (Doc. 109-2, SRP SSOF Ex. 13 at 1–2.) C&M then assigned its interest in the 1920 Agreement to the Carrick & Mangham Agua Fria Lands and Irrigation Company ("C&MAFLIC"). (Doc. 109-2, SRP SSOF Ex. 14.)

### C. The 1921 Contract

On August 25, 1921, the Association and C&MAFLIC entered into a new agreement for the provision of water (the "1921 Contract"). (Doc. 109-2, SRP SSOF Ex. 4.) The 1921 Contract, however, contained an express provision preventing it from going into effect until the Secretary of the Interior issued his approval. (Doc. 109-2, SRP

SSOF Ex. 4 at 19.) The Secretary subsequently issued his authorization on October 26, 1921, and the contract went into effect that day. (Doc. 109-2, SRP SSOF Ex. 4 at 19.) Despite the Secretary's authorization, however, the terms of the contract dictated that the agreement was "by and between" C&MAFLIC and the Association. (Doc. 109-2, SRP SSOF Ex. 4 at 1.) The 1921 Contract contained a further provision through which C&M agreed that "all water received by it under this agreement shall be distributed and apportioned only in compliance with those provisions of the [Warren Act] . . . which limit the use of waters pumped from United States Reclamation Service Projects to 160 acres for any one land owner." (Doc. 109-2, SRP SSOF Ex. 4 at 11.) Despite this, the 1921 Contract does not contain any additional references to the Warren Act.

Paragraph 9 of the 1921 Contract further provided that C&MAFLIC "agree[d] to operate said pumps, wells, . . . and other works constructed and installed by it, for the term of ninety-nine (99) years." (Doc. 109-2, SRP SSOF Ex. 4 at 8–9.) The contract mentions a 99-year period in one additional place, requiring that the Association "agree that it will furnish and sell to the Company [C&MAFLIC] and the Company agrees to purchase during a period of 99 years, all electric power which may be necessary for pumping water . . . ." (Doc. 109-2, SRP SSOF Ex. 4 at 4–5.) C&MAFLIC would subsequently assign its interest in the 1921 Contract to RID—the party before the Court today—in July 1923. (Doc. 109-2, SRP SSOF Ex. 15 at 1.)

### D. The 1927 Amendments

In 1927, the Association and RID would enter into an additional agreement (the "1927 Amendment") to modify the terms of the 1921 Contract. (Doc. 109-2, SRP SSOF Ex. 16.) The Secretary of the Interior would then approve the agreement on February 12, 1927, after which the 1927 Amendment entered into effect. (Doc. 109-2, SRP SSOF Ex. 16 at 14.) Despite making a number of alterations to the 1921 Contract, the language of the 1927 Amendment expressly provided that the original contract "shall remain in full force and effect, except as altered and amended by this supplemental agreement." (Doc. 109-2, SRP SSOF Ex. 16 at 13–14.) In the event of a conflict between the two

documents, however, the "terms and conditions" of the 1927 Amendments were deemed to govern. (Doc. 109-2, SRP SSOF Ex. 16 at 13–14.)

### E. 1950 Amendments

Disagreements between the Association and RID would soon follow, as the parties engaged in a dispute over the amount of water that could be pumped under the terms of the 1921 Contract and 1927 Amendment. (Doc. 109, SRP SSOF ¶ 51; Doc. 171, RID SSOF ¶ 126.) The dispute between the parties soon escalated with the Association filing suit against RID in the Maricopa County Superior Court in September 1945. (SRP SSOF ¶ 51; RID SSOF ¶ 126.) On May 31, 1950, the Association and RID would enter into a settlement agreement (the "1950 Amendment") to settle the Association's claims in the 1947 lawsuit. (Doc. 109-2, SRP SSOF Ex. 17.)

Finally, in the 1980s, a series of disputes over the water rights of the Salt River Pima-Maricopa Indian Community ("the Community") broke out amongst water-rights holders in the Maricopa County area. In an effort to settle these disputes, Congress passed the Salt River Pima-Maricopa Indian Community Water Rights Settlement Act in 1988. Pub. L. 100-512, 102 Stat. 2549 (1988). Although the Act was designed primarily to settle pending state and Federal litigation to determine the extent and nature of the Community's water rights, Section 6(a) of the Act additionally "ratified, confirmed, and declared to be valid" the 1921 Contract between the Association and C&MAFLIC—along with the 1927 and 1950 Amendments. *Id*. The parties continue to dispute the terms of that ratified contract before the court today.

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect

the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *United States v. Carter,* 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

III.    **ANALYSIS**

SRP moves for summary judgment as to RID's Complaint, in addition to Count One of its counterclaim. RID, in turn, moves for summary judgment on its offensive claims, as well as Counts One through Four of SRP's counterclaim. The Court first addresses the pending Motions on RID's Complaint, before moving to the parties' arguments regarding SRP's counterclaims.

. . . .

. . . .

. . . .

. . . .

- 9 -

### A.    RID's Claims

RID moves for summary judgment on its own Complaint, and the Court addresses its Motion and SRP's Motion conjunctively in that respect.[3]

#### 1.    Count I: Contractual End Date

RID asserts that it is entitled to summary judgment as to the term of the contract—as amended—between RID and SRP. (RID MSJ at 9–17.) Namely, it argues that no genuine dispute of material fact exists as to RID's rights under the Contracts at issue beyond October 26, 2020. SRP on the other hand, argues that the Contracts had an express 99-year term when it initially went into effect, and that this term has never been modified. (SRP Resp. at 17–28.)

At the core of this matter, the parties' dispute is over the interpretation of the 1921 Contract, the 1927 Amendment, the 1950 Amendment, and the Warren Act. In addition to copies of the Contracts at issue, the parties have submitted numerous statements of fact and exhibits dating back to 1904. This deluge of documents necessitates that this Court determine what, if any, extrinsic evidence it may consider when determining the terms of the Contracts at issue.

Federal law governs the interpretation of contracts where the United States is a party. *Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th 2001). As such, federal law has traditionally governed the interpretation of reclamation contracts.[4] *See, e.g., id*; *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). When interpreting contracts, courts may look to general

---

[3] Although SRP has indicated that it seeks summary judgment on RID's Complaint, it does so by and through its arguments as to Count One of its counterclaim. Thus, with respect to the length of the contract, the Court only construes RID to have moved for summary judgment.

[4] The parties do not appear to dispute the choice of law governing the interpretation of the contracts at issue. (*See* RID MSJ at 6–9; SRP Reply at 14–15.) Although this Court must determine whether the contracts at issue are authorized by and entered into under the authority of the Warren Act, it is undisputed that Congress has ratified and made valid the contracts. *See* The Salt River Pima-Maricopa Indian Community Water Rights Settlement Act, Pub. L. 100-512, 102 Stat. 2549 (1988). As such, federal common law—rather than Arizona law—applies to the interpretation of the Contracts at issue. *See Mohave Valley Irrigation & Drainage Dist*, 244 F.3d at 1165.

principals of contract law, including the Uniform Commercial Code ("UCC"). *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989); *O'Neill v. United States*, 50 F.3d 677, 684 (9th Cir. 1995).

"A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users' Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999). Courts should consider "the plain language of the contract" first, giving contract terms "their ordinary meaning." *Id.* When extrinsic evidence is offered to supplement a contract, federal common law follows the traditional parol evidence rule. *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 560–61 (9th Cir. 2016). Thus, a contract must "be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the [contract]." *Id.* (quoting *United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005)). A contract is ambiguous "if reasonable people could find its terms susceptible to more than one interpretation." *Id.*

A court, however, may consider "extrinsic evidence of trade usage, course of dealing, and course of performance between the parties" when determining if a contract is, in fact, ambiguous. *Westlands Water Dist. v. United States,* 337 F.3d 1092, 1101 (9th Cir. 2003). Although "[e]xtrinsic evidence cannot contradict a clear contract term in a final expression of an agreement," *id.*, evidence of this sort is relevant "even if the contract terms are clear." *O'Neill*, 50 F.3d 677 at 684 (quoting *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 783 n.16 (9th Cir. 1981)).

"[C]ourts should not construe an ambiguous writing to create lifetime promises." *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 936 (2015). Thus, a court should not treat a contract that is silent as to its duration as "'operative in perpetuity' but as 'operative for a reasonable amount of time.'" *Id.* (quoting 3 A. Corbin, Corbin on Contracts § 553, at 216 (1960)).

The Court turns first to the plain language of the contract at issue to determine the length of the contractual term. *See Klamath Water Users' Ass'n*, 204 F.3d at 1210. The

initial 1921 Contract contains two provisions referencing a ninety-nine year term for the Contract. First, Paragraph 5 of the 1921 Contract provides that:

> The Association further covenants and agrees that it will furnish and sell to the Company and the Company agrees to purchase during a period of 99 years, all electric power which may be necessary for pumping water from any of the wells mentioned in this contract for the irrigation of 35,000 acres of land contemplated in this contract . . . .

(Doc. 109-2, SRP SSOF Ex. 4 at 4–5.) Additionally, Paragraph 9 of the 1921 Agreement provides that "The Company further covenants and agrees to operate said pumps, wells, equipment for power, canals, ditches and other works constructed and installed by it, for the term of ninety-nine (99) years." (Doc. 109-2, SRP SSOF Ex. 4 at 6.) Although the contractual duration of RID's right to pump in the initial 1921 Contract was perhaps arguable, this Court is foreclosed from making that determination. "Once a court has interpreted an ambiguous contract provision that is and has always been the correct interpretation from its formation." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015). Analyzing the same 1921 Contract, the Supreme Court of Arizona previously determined contract duration was ninety-nine years. *See Brewster*, 229 P. at 931. Thus, although RID argues that the parties' course of dealing prior to the 1921 contract demonstrates an intent to provide RID a permanent water supply (RID MSJ at 18), *Brewster* forecloses that argument.

The court's decision in *Brewster*, however, does not foreclose RID's argument that the Contracts at issue, following the 1927 and 1950 amendments, became perpetual. It is undisputed that three years after *Brewster*, RID and the Association agreed to modify the 1921 Contract. (Doc. 109-2, SRP SSOF Ex. 16.) Thus, although the *Brewster* Court's interpretation of the 1921 Contract remains instructive, the Court is not prevented from finding that subsequent amendments to the 1921 Contract created a perpetual agreement. Indeed, RID argues that language in the 1927 Amendment expressly deleted any reference in the original 1921 Contract to a ninety-nine year term. (RID MSJ at 9.)

Contrary to RID's arguments, the term of the Contracts at issue following the 1927 Amendment is, at best, ambiguous. Paragraph D of the 1927 Amendment reads: "it is understood and agreed that paragraphs 8 and 9 of said 1921 agreement are altered and amended to read as follows." (Doc. 109-2, SRP SSOF at 5.) The Amendment then delineates two and a half pages of revisions, stylized as paragraphs 8-a through 8-e. (Doc. 109-2, SRP SSOF Ex. 16 at 5–8.) These revisions, however, do not mention either a ninety-nine year term or any other term-of-years. RID, however, argues that by reading the amendment in conjunction with language such as "at no time," the 1927 Amendment unambiguously created a perpetual right under the contract. (RID MSJ at 12, Doc. 109-2, SRP SSOF Ex. 16 at 7 ¶ (8-d).)

In light of the earlier ninety-nine year term, the Court finds the language of the 1927 Amendment ambiguous at best. It is arguable that by stating that "paragraphs 8 and 9 . . . are altered and amended to read as follows," the parties completely replaced the two paragraphs, removing the term of 99-years and replacing it with a perpetual term. But, it also is arguable, as SRP so argues, that the revisions only apply tangentially to Paragraph 9. (SRP Resp. at 10.) This argument has some force as the amended paragraphs are stylized solely as subparagraphs of Paragraph 8. (*See* Doc. 109-2, SRP SSOF Ex. 16 at 5–8.) Further, the use of the phrase "at no time" is perfectly consistent with a contract for a term of years. Thus, without more, this Court finds that the text of the contract is ambiguous as to the length of the contractual term.

Having determined that the language of the contract is ambiguous, the Court may turn to the copious amount of extrinsic evidence submitted by each party. *See Tohono O'odham Nation*, 818 F.3d at 560–61. Perhaps unsurprisingly, with nearly one hundred years of documentation at the parties' disposal, the evidence points in both directions. SRP has submitted sufficient probative evidence to establish a genuine dispute of material fact. The evidence adduced by SRP shows that, throughout most of the 20th Century, those at RID considered the contracts to still contain a ninety-nine year term. (*See, e.g.*, SRP Resp. at 19, Doc. 280-2 SRP SSOF Ex. 60 at 57:6-20.) Additionally,

evidence shows that in the midst of litigation between RID and SRP in Maricopa County Superior Court during the 1960s, attorneys representing RID made statements strongly suggesting that the contract between RID and the Association ran for ninety-nine years, even following the 1927 Amendment. (Doc. 280-2 SRP SSOF Ex. 94 at 7.) These facts, in conjunction with the ambiguous term in the contract, create a genuine issue of material fact sufficient to preclude summary judgment. As such, RID has not met its burden of proof for summary judgment on its Complaint. The length of contract's term must be determined at trial.[5]

## B. SRP Counterclaims

The parties both move for summary judgment on Count One of SRP's counterclaim. Additionally, RID moves for summary judgment on the remaining counts of SRP's counterclaim. The Court addresses the Motions on Count One first, before moving to the Motion on the remaining claims.

### 1. Count I: Declaratory Judgment Under the Warren Act

In support of its Motion for Summary Judgment on Count One of its counterclaim, SRP first argues that the 1921 Contract must, as a matter of law, be a Warren Act contract by virtue of its subject matter. (SRP MSJ at 9). SRP contends that at the time of the contract the Secretary of the Interior "could authorize a contract for delivery of Reclamation project water to non-Reclamation project users . . . only if the contract was in compliance with the Warren Act." (SRP MSJ at 9.) From this, SRP concludes that if the 1921 Agreement is not a Warren Act contract, no legal authority existed at the time for its approval. (SRP MSJ at 9–10.) RID contends that the Contracts fail to meet the statutory criteria set out in the Warren Act, thus failing as Warren Act contracts as a matter of law. (RID MSJ at 25–28.)

_____

[5] RID has additionally moved for summary judgment on Count Two of SRP's counterclaim, which seeks a declaratory judgment that the Contracts at issue are not perpetual. Because this Count largely mirrors RID's Complaint, the Court also denies RID's Motion for Summary Judgment on that claim.

Just as with a contract, a court analyzing statutory text "begins with the plain language of the statute. *Jiminez v. Quarterman*, 555 U.S. 113, 118 (2009). Where the language of a statute is plain, a court "must enforce it according to its terms." *Id.; Flores v. City of San Gabriel*, 824 F.3d 890, 901 (9th Cir. 2016).

Congress passed the Warren Act, ch. 141, 36 Stat. 925 (codified at 43 U.S.C. §§ 523–25) in 1911 as a supplement to the Reclamation Act, which authorized the Secretary of the Interior to contract for the delivery of surplus water to non–project irrigators. *See Minidoka Irrigation Dis. v. Dept. of Interior*, 406 F.3d 567, 570 (2005). Under its terms, the Warren Act contemplates two types of contracts. The first, under Section One of the Act, permits "the Secretary of the Interior . . . to contract for the impounding, storage, and carriage of water." 43 U.S.C § 523. Under these "Section One Contracts," the Secretary must "preserv[e] a first right to lands and entrymen under the project" and ensure "[t]hat water so impounded, stored, or carried" is not used "other than as prescribed by law as to land" privately held within reclamation projects. *Id.* On the other hand, Section Two provides that "the Secretary of the Interior is authorized" to cooperate in "the construction or use of such reservoirs, canals, or ditches . . . for impounding, delivering and carrying water for irrigation purposes." 43 U.S.C. § 524. Section Two further provides that the water furnished under the section shall not be delivered to "one landowner in excess of an amount to irrigate one hundred and sixty acres." *Id.*

The Court finds the plain language of the statute, to be clear and unambiguous.[6] Indeed, the statute authorizes "the *Secretary of the Interior . . . to contract*" with another party for the "impounding, storage, and carriage of water." *See id.* (emphasis added). The phrase "to contract" carries with it the implication that the one who "contracts" enters an enforceable agreement. *See Black's Law Dictionary* 342 (8th ed. 2004). Notably, neither SRP nor the United States offers an alternate interpretation of this language in the Warren

---

[6] Neither SRP nor the Federal Defendants have asserted that the Contracts fall under Section Two of the Warren Act. Accordingly, the Court focuses on Section One for the purpose of the Motions for Summary Judgment.

Act.[7] At best, SRP and the United States argue that this Court should read the phrase "to contract" within Section One to mean "to approve a contract." This reading does not find support in the statutory text. Thus, in singling out the Secretary as the one authorized "to contract," the statute lends itself to only one interpretation. For a contract to fall under the ambit of Section One of the Warren Act, the Secretary of the Interior—and thus the United States—must enter a contract for the "impounding, storage, or carriage of water." *See* 43 U.S.C. § 523.

Although not dispositive to this Court's interpretation of the statute, the inability of either party and this Court to identify a single Warren Act contract in existence—other than the agreements at issue here—where the United States is not a party to the agreement further buttresses the Court's conclusions. As Federal Defendants' 30(b)(6) witness, Karl Stock, testified during questioning by counsel for RID, the agreements between SRP and RID are the only known contracts allegedly authorized by the Warren Act to which the United States was an "approver" rather than a "party." (Doc. 171-2, RID SSOF Ex. 3 at 61:1-18.) Similarly, the parties have not pointed to, nor has the Court identified through its own efforts, any case law in which a contract governed by the Warren Act did not have the United States as a party to the agreement. *See, e.g.*, *Nebraska v. Wyoming*, 325 U.S. 589, 595 (1945); *United States v. Tilley*, 124 F.2d 850, 853 (8th Cir. 1941); *Verde River Irrigation & Power Dist. v. Work*, 24 F.2d 886 (D.C. Cir. 1928); *Ramshorn Ditch Co. v. United States*, 269 F. 80, 88 (8th Cir. 1920); *N. Colo. Water Conservancy Dist. v. Unites States*, 88 Fed. Cl. 636, 644 (Fed. Cl. 2009); *Goshen Irrigation Dist. v. Pathfinder Irrigation Dist.*, 62 F. Supp. 2d 1218, 1221–22 (D. Wyo. 1999); *Bean v. United States*, 163 F. Supp. 838, 841–42 (Ct. Cl. 1958).

With this in mind, the Court must determine whether the Secretary is in fact a party to the 1921 Contract and its subsequent amendments. The face of the 1921

---

[7] Moreover, much of SRP's argument in its Motion for Partial Summary Judgement supports the Court's conclusion that it must be the Secretary "to contract" for a contract to fall under the statutory authorization of the Warren Act. (*See, e.g.*, SRP MSJ at 9 ("That section authorizes the Secretary to contract with irrigators and irrigation districts to deliver water associated with excess project capacity.").)

Contract, however, is clear. As the contract indicates, the parties at the time of signing were C&MAFLIC and the Association. (Doc. 109-2, SRP SSOF Ex. 4 at 1.) The contract lists neither the Secretary of the Interior nor the United States as party to the agreement. Instead, the Secretary only issued his approval, which was required by the terms of the contract for the agreement to go into force. (Doc. 109-2, SRP SSOF Ex. 4 at 19.) Neither amendment to the 1921 Agreement contains language revising this aspect of the contract. The 1927 Amendment lists as the parties to the agreement both RID—as the successor in interest to C&M—and the Association. Again, neither the Secretary nor the United States is listed as party to the Amendment. (Doc. 109-2, SRP SOF Ex. 16 at 1.) Similarly, the 1950 Amendment again lists RID and the Association as the sole parties to the agreement, with the Secretary as a mere approver. (Doc. 109-2, SRP SOF Ex. 17 at 1, 5.)

This determination, however, does not end the Court's inquiry as to SRP's first counterclaim. In its Reply, SRP raises for the first time the argument that SRP entered into the 1921 Contract as agent for the United States.[8] (SRP Reply at 9–10, 17.) Under general principals of agency law, "[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal . . . the principal and the third party are parties to the contract." Restatement (Third) of Agency § 6.01. Thus, if the contracts were entered into by the Association as the agent of the Secretary, the Contracts would fall under the statutory authorization of the Warren Act because the Secretary would be party to the agreement. As such, this Court must determine whether SRP, acting as the agent for the United States, had the authority to bind the government in contract.

SRP argues that, by virtue of the 1917 Contract between the Association and the United States, the Association became "an agency of the government through which the Secretary of the Interior worked and operated in connection with the property and water belonging to the Salt River Project." (SRP Reply at 16.) Thus, SRP concludes that "[t]he 1921 Agreement, upon approval by the Secretary, became and was the contract and

---

[8] Although SRP did not raise this argument until its Reply, the Court chooses to address it to dispose of the cross-motions for summary judgment.

agreement of the United States of America made by the Secretary of the Interior in direct pursuance of the power conferred upon him by the Warren Act." (SRP Reply at 16 (citation omitted).)

Courts have addressed this issue on at least two prior occasions. First, in *City of Mesa v. Salt River Project Agricultural Improvement & Power District*, 416 P.2d 187 (Ariz. 1966), the City of Mesa appealed the dismissal of an eminent domain action to condemn portions of an electrical plant controlled by the District. The trial court, however, dismissed the action, finding that the United States was an indispensable party to the proceeding. *Id.* at 75. In affirming the dismissal of the action, the Supreme Court of Arizona acknowledged that under its 1917 Contract with the United States, "the Association was designated by the United States as agent for the care, operation, and maintenance of Project facilities." *Id.* at 78.

The Supreme Court of Arizona, however, qualified that finding in *Salt River Valley Water Users' Ass'n v. Giglio*, 549 P.2d 162 (Ariz. 1976). There, the Association appealed a jury verdict awarding compensatory and punitive damages to a group of plaintiffs whose homes suffered damage during flooding from the Arizona Canal. *Id.* at 191–92. The Association argued that, as the "agent of the United States in the operation of the Project and that as an agent of the United States government, it [was] immune from suit for its acts." *Id.* at 195. Thus, it could not be held liable for damages. *Id.* The court, however, rejected SRP's argument. *Id.* Interpreting the 1904 and 1917 Contracts with the United States, the court found no showing that "the Association, in the operation of the Project, is acting under the control of the United States and for the benefit of the United States." *Id.* at 196. Thus, the court held that no "principal-agent relationship existed between the United States and the Association." *Id.* Instead, it found that "the contracts more nearly r[e]flect a landlord-tenant rather than an agency relationship." *Id.* at 197. The Court finds no reason to depart from the rationale of *Giglio*. Further, SRP has made no affirmative showing that it entered the 1921 Contract as the agent for the United States. Instead, the relationship between the two more nearly reflects a landlord-tenant

relationship. *See id.* As such, SRP has not bound the Secretary or the United States in its contract with RID.[9] Accordingly, the contracts do not fall under the Warren Act because the Secretary has not "contract[ed]."

Finally, SRP argues that, because the Contracts at issue concern the "delivery of Reclamation project water to non-Reclamation project users only for irrigation use," the only legal authorization for the Agreements at the time was found under the Warren Act. (SRP MSJ at 9.) Although SRP's argument is well-struck, this Court need not decide what statutory authorization existed for the Contracts at issue in 1921. Regardless of the legality of the agreement under Reclamation law as it stood in 1921, Congress expressly validated the contracts between SRP and RID in 1988 in conjunction with settling an ongoing dispute with the Salt River Pima-Maricopa Indian Community. Pub. L. 100-512, 102 Stat. 2549 (Oct. 20, 1988) ("The contract between [the Association] and [RID] . . . is ratified, confirmed, and declared to be valid."). Thus, the Agreements are now valid.

### 2. Express Incorporation of Warren Act Terms

SRP further argues that the 1921 Contract and its subsequent amendments expressly incorporate the terms of the Warren Act. (SRP MSJ at 10–11.) In support, SRP points to Paragraph 13 of the Agreement, which specifies that all water received by RID under the agreement "shall be distributed and apportioned only in compliance of the Act of Congress approved February 21, 1911, known as the 'Warren Act' which limit the use of waters pumped from United States Reclamation Service Projects to 160 acres for any one land owner." (SRP MSJ at 10; SRP SOF, Ex. 4 at 13, ¶ 13.) In opposition, RID argues that, at best, the agreement only incorporates the Warren Act's 160-acre limitation. (RID MSJ at 34.)

---

[9] This conclusion is consistent with the position that the United States has taken through the pending litigation. In its Response to RID"s First Set of Requests for Admissions, the United States takes the position that it is "not a party" to the 1921 Contract, nor the 1927 or 1950 Amendment. (Doc. 189-2, Federal Defendant's Reply Joinder Ex. 1 at 3, 5.) Testimony from the Federal Defendants' 30(b)(6) witness further solidifies this conclusion. ((Doc. 171-2, RID SSOF Ex. 3 at 61:1-18.)

The parties do not dispute that Paragraph 13 remains in force through the 1927 and 1950 Amendments. Thus, the dispute between the parties is not one about the existence of the term but rather one about the term's scope. Thus, this Court must interpret the language of the contractual term. The unmodified language of Paragraph 13 reads:

> The Company [RID] further covenants and agrees that all water received by it under this agreement shall be distributed and apportioned only in compliance with those provisions of the Act of Congress approved February 21, 1911, known as the "Warren Act" which limit the use of waters pumped from United States Reclamation Service Projects to 160 acres for any one land owner.

(SRP SOF Ex. 4 at 13 ¶ 13.)

At first glance, the plain language of the text best lends itself to the reading advocated by RID: that the contract incorporates only Warren Act "provisions . . .which limit the use of waters" to 160 acres. (*See* SRP SOF Ex. 4 at 13 ¶ 4.) However, the only provision of the Warren Act specifically referencing the 160 acre provision falls within Section Two. *See* 43 U.S.C. § 524. As both RID and SRP agree, Section Two contracts relate to the "construction of additional capacity" beyond what a Reclamation project might already contain. (SRP MSJ at 9, RID MSJ at 27.) This calls into question exactly what provisions of the Warren Act are incorporated by Paragraph 13. Further, even if the Court thought the language of Paragraph 13 was unambiguous, it may look to extrinsic evidence of "trade usage, course of dealing, and course of performance between the parties" to determine if any latent ambiguity exists. *See Westlands Water Dist.*, 337 F.3d at 1101. Thus, the parties may introduce "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding." U.C.C. § 1-303(b). Additionally, the Court can examine evidence of conduct between the parties following the agreement if "(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." U.C.C. § 1-303(a)(1)–(2).

SRP has introduced such evidence from prior dealings between itself and C&M—RID's predecessor in interest—and between it and RID following the execution of the contracts. First, SRP points to the supplement to the 1920 Agreement between C&M and SRP, which explicitly contained language recognizing that particular additions were made in order to ensure consistency with the Warren Act. (SRP SSOF, Ex. 13 at 1–2.) Further, evidence produced by SRP in the years following the execution of the contracts show that SRP and the Bureau of Reclamation repeatedly represented that RID lands were governed by provisions of the Warren Act. (Doc. 109-2, SRP SSOF Ex. 27.) These pieces of evidence create sufficient ambiguity in the contractual term to deny summary judgment either way. Accordingly, the extent of the incorporation of Warren Act terms into the Contract must be adduced at trial.

### 3. Counts III and IV of SRP's Counterclaim

Additionally, RID moves for summary judgment on Counts Three and Four of SRP's counterclaim, arguing that the Contracts at issue do not bar non-irrigation use or the use of water on more than 160-acres per landowner. These claims, however, flow from Count I of SRP's counterclaim. Thus, although this Court finds that the Warren Act does not govern the Contracts as a matter of law, an open question remains as to the extent the parties incorporated the terms of the Warren Act into the Contracts at issue. Thus, RID does not meet its burden for summary judgment on the issue.[10]

RID, however, argues that regardless of the terms incorporated into the contract with SRP, the statute of limitations on enforcement and the doctrine of laches bar the enforcement of any 160 acre provision in the contract.[11] In opposition, SRP argues that

---

[10] For similar reasons, the Court rejects RID's arguments as to lack of standing to assert claims against RID for the rates charged for the delivery of water. Because the extent of the incorporation of Warren Act terms must be determined at trial, the Court declines to find that SRP lacks standing to assert this claim.

[11] RID additionally asserts a statute of limitations and laches defense as to non-irrigation uses of water (*see* RID MSJ at 41–42); however, RID does not cite to any facts within this section that support a finding that SRP knew or should have known about any non-irrigation use. Thus, RID has not met its burden for showing its entitlement to the defense as a matter of law.

the equitable defense of laches cannot apply against the United States. (SRP Reply at 17.) Thus, as the agent of the United States, it argues the defense equally does not apply against it.

Laches is an equitable defense to a civil action. "To establish laches, a defendant must establish (1) lack of diligence by the plaintiff, and (2) prejudice to the defendant." *Grand Canyon Tr. v. Tucson Elec. Power Co.*, 391 F.3d 979, 987 (9th Cir. 2004). When evaluating the reasonableness of any delay, courts measure from the time that the party "knew (or should have known) of the allegedly" impermissible conduct. *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012). The defense of laches, however, generally does not apply against the United States. *See, e.g., California ex rel. State Land Comm'n v. United States*, 512 F. Supp. 36, 40 (N.D. Cal. 1981).

Although SRP is correct on the law as to the defense of laches, its argument for why the defense should not apply to it fails for the same reason that the Contracts at issue are not, as a matter of law, Warren Act contracts: SRP is not the United States. As SRP notes, the basis for the rule that laches will not lie against the Government is rooted in "the sovereign immunity doctrine." *California ex rel. State Land*, 512 F. Supp. at 40. Sovereign immunity, however, does not apply to SRP. *See Giglio*, 549 P.2d at 167 (rejecting the Association's argument that it is immune from suit as the agent of the United States).

The Court, however, will not grant summary judgment based on the defense of laches for two reasons. First, as SRP argues, the Contracts were "ratified, confirmed, and declared to be valid" by Congress in the Salt River Pima-Maricopa Indian Community Water Rights Settlement Act of 1988, thus reaffirming the terms of the contract. Pub. L. 100-512 (1988). The evidence cited by RID in support of its defense of laches all predates this enactment. Thus, the evidence presented by RID does not support a finding that SRP knew or should have known of the violation of the 160 acre provision following 1988.[12] Second, the Court cannot say with certainty that RID will suffer significant

---

[12] The Court rejects RID's statute of limitations argument for the same reason.

prejudice given the Contract's potential expiration in 2020. RID argues that it would suffer expectations based prejudice should it be forced to limit water delivery to 160 acres per land owner because such a limit would require RID lands to be broken up. (RID MSJ at 45.) If the Court, however, were to find at trial that the contract term is limited to 99 years, RID would be forced to negotiate a new contract in which it could bargain for a different term. Accordingly, the Court does not find at this time that the prejudice to RID is sufficient to apply the doctrine of laches.

Accordingly, RID's Motion for Summary Judgment on Counts III and IV of SRP's counterclaim is denied.

## IV. CONCLUSION

Regarding the claims in RID's Complaint, RID fails to show that no genuine dispute of material fact exists as to RID's right to pump under the Contracts at issue beyond October 26, 2020. Accordingly, the length of the contractual term must proceed to trial.

Regarding Count I of SRP counterclaims, for a contract to fall under the authorization of the Warren Act as a matter of law, the Secretary of the Interior must be a party to said contract. No genuine dispute exists as to the Secretary's status as a non-party to the agreement. Thus, the Contracts at issue are not, as a matter of law, Warren Act contracts. A genuine dispute remains, however, as to the extent the parties incorporated the terms of the Warren Act into the Contracts at issue. Count I shall proceed to trial on this basis. Further, because disputes exist as to the incorporation of Warren Act terms into the contract, a genuine dispute of material fact remains as to Counts III and IV of SRP's counterclaim. As such, these claims shall proceed to trial.

**IT IS THEREFORE ORDERED** granting in part and denying in part Plaintiff Roosevelt Irrigation District's Motion for Partial Summary Judgment. RID is entitled to partial summary judgment on Count I of SRP's counterclaim to the extent that the

Although evidence submitted by RID shows that SRP had or should have had knowledge of RID's violations of the 160 acre provision, RID has not produced evidence showing or tending to show knowledge by SRP following the statutory enactment of the Salt River Pima-Maricopa Indian Community Water Rights Settlement Act in 1988.

Contracts at issue are not authorized by the Warren Act as a matter of law. The balance of RID's Motion is denied.

**IT IS FURTHER ORDERED** denying Defendants and Counterclaimants Salt River Project Agricultural Improvement and Power District and Salt River Valley Water Users' Association's Motion for Partial Summary Judgment.

Dated this 30th day of September, 2017.

Honorable John J. Tuchi
United States District Judge